**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

---

| | |
|---|---|
| **XEROX CORPORATION and** : | |
| **XEROX BUSINESS SERVICES, LLC,** : | |
| : | |
| **Plaintiffs,** : | |
| : | **CIVIL ACTION NO. 15-cv-** |
| **v.** : | |
| : | |
| **CHRISTOPHER L. TRANQUILL,** : | |
| **JEFFREY S. YENTIS,** : | **INJUNCTIVE RELIEF REQUESTED** |
| **BRIAN K. TIMMONS,** : | |
| : | |
| **and** : | |
| : | |
| **TopBox, LLC,** : | |
| : | |
| **Defendants.** | |

---

## COMPLAINT

Plaintiffs Xerox Corporation and Xerox Business Services, LLC (collectively "Xerox" or "the Company"), by and through their undersigned counsel, hereby bring this Complaint for damages, equitable and other relief against Defendants Christopher L. Tranquill ("Tranquill"), Jeffrey S. Yentis ("Yentis") and Brian K. Timmons ("Timmons") for breach of contract and breach of the employee duty of loyalty; and against all Defendants for misappropriation of Xerox confidential information and trade secrets, CONN. GEN. STAT. § 35-51 *et seq*.; interference with the contractual relations between Xerox and its employees; interference with the actual and/or prospective business relations of Xerox with its customers; and unfair competition. In support of these claims, Xerox avers as follows:

## I.     THE PARTIES

**A.     Xerox Plaintiffs**

1.     At all times pertinent hereto, Xerox Corporation was and is a corporation organized and incorporated in the State of New York, maintaining its principal place of business and transacting business in this district at 45 Glover Avenue, Norwalk, Connecticut 06856-4505. Xerox Corporation is a corporate citizen of the State of New York and the State of Connecticut.

2.     At all times pertinent hereto, Xerox Business Services, LLC was and is a corporation organized and incorporated in the State of Delaware.  The sole member of Xerox Business Services, LLC is Xerox Corporation and, accordingly, for diversity of citizenship purposes, Xerox Business Services, LLC is, like Xerox Corporation,  a corporate citizen of New York and Connecticut.

**B.     Defendants Tranquill, Yentis, Timmons and TopBox, LLC**

3.     Defendant Christopher Tranquill is, upon information and belief, a citizen, resident and domiciliary of the State of Oregon, last known to reside at 22645 SW Conifer Drive, Sherwood, Oregon 97140.  Tranquill is one of the three Officers identified in the registration filing for Defendant TopBox, LLC - - the other two Officers being Defendants Timmons and Yentis.

4.     Defendant Jeffrey Yentis is, upon information and belief, a citizen, resident and domiciliary of the State of Maryland with a last known address of 12000 Trailridge Drive, Potomac, Maryland 20854.  Yentis is one of the three Officers identified in the registration filing for Defendant TopBox, LLC - - the other two Officers being Defendants Tranquill and Timmons.

5.     Defendant Brian Timmons is, upon information and belief, a citizen, resident, and domiciliary of the State of Colorado, with a last known address at 8798 Forrest Drive, Highlands

Ranch, Colorado 80126.  Timmons is one of the three Officers identified in the registration filing for Defendant TopBox, LLC - - the other two Officers being Tranquill and Yentis.

6.      Defendant TopBox, LLC is, upon information and belief, a limited liability corporation  registered in the State of Delaware and whose Officers are identified in its registration filing as Defendants Tranquill, Yentis and Timmons.  Upon information and belief, Defendants Tranquill, Yentis and Timmons are also the sole members of  TopBox LLC and, accordingly, TopBox LLC is a citizen and resident of the States of Oregon, Maryland and Colorado, the states in which its members are citizens as set forth hereinabove.

## II.      JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S. § 1332, as it involves a dispute between citizens of different states, specifically Xerox Corporation and Business Services, LLC, which are citizens of the States of New York and Delaware, respectively, with their principal places of business located in Norwalk, Connecticut, on the one hand, and Tranquill, Yentis, Timmons, and TopBox, LLC, who are citizens of Oregon, Maryland and Colorado, respectively, on the other hand.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.      Injunctive relief is sought against all Defendants pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## III.      INTRODUCTION

9.      This case arises from the actions of the individual Defendants, acting in conspiracy with one another, which started during the time they were employed by Xerox in senior management and/or senior sales positions, respectively, as follows:

- Tranquill was head of Xerox's Customer Care Services business unit, specifically, as Senior Vice President (SVP) and Group President, Xerox Business Solutions;

- Yentis was Xerox's Managing Director, Technology Call Centers - - and he served under

DM1\5453607.2

Defendant Tranquill's supervision in the Customer Care Services business unit of Xerox Business Services;

- Timmons was a Xerox Senior Vice President of Sales, Telecom & Technology for Xerox's Customer Care Services business - - and he also served under Defendant Tranquill's supervision.

10.     Tranquill ultimately resigned his Xerox employment on or about October 10, 2014 - - but, for at least <u>eleven (11) months or more prior to his resignation,</u> he had been actively plotting with Defendants Yentis and Timmons to start up a company that would compete with Xerox for customer care business and Xerox customers.

11.     For at least the eleven (11) month period prior to tendering his October 10, 2014 resignation to Xerox - - and at all times during this known minimum period of 11 months - - the evidence shows that, notwithstanding his efforts to keep it secret, Tranquill:

- Solicited Yentis and/or Timmons at some time in or before November 2013 (and continuing into 2014) to join him in starting a competing company to Xerox;

- Worked together with Timmons and Yentis, in the November 2013 to February 2014 time frame, and continuing at all times thereafter, to identify investors and potential customers of their new business, including one or more key Xerox customers;

- Conspired with Defendant Timmons, in early November 2013, to have Defendant Timmons engage in one or more "initial conversations" with one or more key representatives of a Xerox client Defendants served, and after which Timmons reported to Tranquill the client's alleged prediction that Defendants would "have a pretty good shot at getting a deal" with this Xerox client doing millions of dollars in annual business;

- Agreed amongst each other, as early as November 2013, to conduct their activities in secret and to direct communications and/or materials to private outside e-mail or other sites they controlled in order to maintain the secrecy of their plans and activities;

- Registered a website, on February 4, 2014, for the competing company they had devised, which by that time had been named "TopBox" (the Defendant herein), and registered or identified it as "topbox analytics" - - the "analytics" moniker identifying it as being engaged in the same technology as that used in Xerox's Customer Care Services business and concerning which Xerox was engaged in numerous strategic initiatives and development projects under Tranquill's direct or indirect supervision - - an area of critical competitive importance to the successful development, ongoing growth, and successful sales performance of Xerox's customer care services business in a highly competitive market environment dependent upon innovation and value-added services to customers;

- Registered TopBox, on March 27, 2014, identifying each individual Defendant in that filing as one of that company's three (3) participant "Officers";

- Remained in Xerox's employment all during this period of at least eleven (11) months, and continuing all the while to exercise supervisory responsibility over, access to, and involvement with, Xerox's development projects - - including a range of strategically and competitively important analytics, data mining and performance evaluations applications - - before ultimately resigning from Xerox on October 10, 2014;

- Orchestrated - - prior to his own October 2014 resignation - - the prior resignations of Timmons (on June 30, 2014) and Yentis (on September 8, 2014), acting in concert with all Defendants, without ever at any time warning or otherwise advising Xerox of these planned resignations or the resignation of other Xerox employees that Xerox believes Defendants may have solicited and who may also be currently affiliated with TopBox;

- Knew, at all times leading up to Timmons' June 30, 2014 resignation, and to Yentis' September 8, 2014 resignation more than two months later, that these resignations were going to occur, and that - - in competition with Xerox and with continuing top-level access to and responsibility Xerox confidential, trade secret and intellectual property information - - TopBox's business and "service offerings" were being created and developed, that one or more multi-million dollar Xerox customers were being solicited to do business with TopBox, and that his (Tranquill's) own resignation and "formal" affiliation with TopBox, Yentis and Timmons was a planned part of Defendants' scheme.

12.     At no time during this period, or up to and including the present time, did

Defendants notify Xerox that they had combined together to:

 (i) register, form and develop a competing company,

(ii) solicit one or more key Xerox customers (with Xerox customers and business

prospects generating revenue of many millions per year) concerning Defendants' desire

to provide them (in their roles as a Xerox competitor) with competing customer care

services, or

(iii) remain involved with Xerox's projects to develop key technological innovations,

applications and ideas, including those involving analytics, and concerning which they

had senior executive supervisory and/or sales responsibility.

13.     Instead, all during this eleven (11) month period or more prior to Tranquill's

eventual October 10, 2014 resignation, Defendants sought funding, approached potential Xerox

customers, maintained access to and responsibility over Xerox's key development projects and customer accounts (including at all times through the date of Tranquill's departure on October 10, 2014), and they have been and are competing and/or preparing to compete with Xerox to offer competitive customer care services in the same market and to the same customers for which they were responsible at Xerox.

14.     Defendants' actions, *while still Xerox employees*, were undertaken, and made possible, by their long-running breach of the employee duty of loyalty; by their maintaining continuing access to and misappropriation of trade secret information; by the breach of their contractual duties of confidentiality; by the breach of their contractual duties not to solicit Xerox employees to leave the Company's employ; by the breach of their contractual duties not to solicit the Company's customers; by their conspiring with one another to the detriment of Xerox; and by their acts of unfair competition, the full extent of which remains unknown pending discovery.

15.     Defendants actions *after their resignations*, and continuing through the present time, have been built upon the improper conduct in which they were engaged at Xerox for many months prior to their resignations from Xerox.  In addition to its capitalizing upon and compounding the consequences of  their pre-resignation conduct, Defendants' continuing activity in competition with Xerox is in further breach of Tranquill's and Yentis' contractual post-employment covenants not to directly or indirectly compete with the Company's business; by Tranquill's and Yentis' breach of their pre- and post-employment covenants not to directly or indirectly solicit the Company's customers; by the continuing use by all Defendants of the confidential and trade secret information acquired under false pretenses and otherwise in violation of both their contracts with the Company, their duties of loyalty, and of the Company's trade secret rights; by their continuing interference with each other's contractual obligations (and, upon information and belief, those of other current or former Xerox employees); by their

6

interference with the actual and prospective contractual relations of Xerox with its customers; and by their continuing acts of unfair competition.

16.     TopBox very recently emerged and touted itself, on a social media site held out to the public by Defendants, as having developed "tools" that enable "our clients to methodically investigate, document and evaluate evidence to determine root causes of the issues that impact customer satisfaction, revenues and costs . . . [and] to document the comprehensive interaction between customers and agents [in customer care call center communications] as interaction DNA strands . . . [that] can be linked with agent performance analytics, creating a complete picture of the contact center opportunities."

17.      The above-described description by TopBox of its services also describes and corresponds to certain core call center service offerings of  Xerox's Customer Care Services for which Defendants were responsible at Xerox; and the "tool" it describes concerning the processing of "evidence" and evaluation of "agent performance analytics" to identify "contact center opportunities" is one of Xerox's key customer care services business areas, and it is the subject of Xerox's past and continuing research and development projects over which Defendants had senior-executive level supervisory and sales responsibility in their former employment with Xerox.

18.     TopBox's social media statement further describes its services as including "specialties" it is offering that  include "Contact Center Operational Improvements, Root Cause Analysis, Structuring Unstructured Data, [and] Process Improvement."  This same description TopBox is now marketing to describe itself also describes the servicing offerings provided by Xerox to its customers and it further describes a key strategic focus of Xerox's research and development efforts - - over all of which Tranquill, Yentis and Timmons had senior executive responsibility in their former employment with Xerox.

19.     Defendants Tranquill, Yentis and Timmons were all responsible for Xerox's Customer Care function, including its Call/Contact Center business and covering the "operational improvements root cause analysis, structuring unstructured data, [and] Process Improvement" that are at the forefront of its development efforts to obtain and maintain its competitive market standing with its customers and prospective customers.  Given their twenty (20), thirteen (13) and five (5) year employment tenures at Xerox, respectively, prior to their secretly-coordinated resignations from the Company, the customer and development information, service offerings, "operational and process improvements,"  data,  analyses, strategies and customers sales plans were all a critical part of their responsibilities at Xerox; and any such "improvements", data, analyses, strategies, sales plans or other developments Tranquill, Yentis and Timmons have brought to "TopBox"  to compete with Xerox for the "opportunities and business relating thereto  - - including with the Xerox customers they served in a confidential capacity on Xerox's behalf - - are deeply rooted in, necessarily and implicitly built upon, and otherwise essentially consist of the confidential, trade secret, and intellectual property and corporate opportunities of Xerox.

**C.     Defendant Christopher L. Tranquill**

20.     Defendant Tranquill is the former head of Xerox's Customer Care Services business unit - - holding the title of Senior Vice President & Group President, Xerox Business Services.  Tranquill was originally employed in 1998 by a Xerox predecessor, Unitel Corporation, as a Call Center Manager in Virginia.  Unitel Corporation was subsequently acquired in 2000 by a company named CyberRep where, in September 2000, Tranquill became that company's Senior Vice President of Operations.  CyberRep was subsequently acquired by Affiliated Computer Services, Inc. ("ACS") in a stock purchase dated January 16, 2003. ACS was, in turn, subsequently acquired by Xerox in a stock purchase on or about February 8, 2010,

maintaining the name "ACS" as a trade name until on or about April 1, 2012 when as a result of a name change it became known as "Xerox Business Services, LLC", plaintiff herein

21.     In consideration of, among other benefits and advantages, Tranquill's promotion to Senior Vice President of Operations, substantial increase in compensation, and transfer from a CyberRep.com operations site located in McLean, Virginia to its location in Portland, Oregon where he would run the company's Northwest Region operations, Tranquill signed a Confidentiality, Non-Solicitation and Non-Competition Agreement (hereinafter, the "2000 Tranquill Agreement"). Attached hereto and incorporated herein by reference as Exhibit "A" is a true and correct copy of the 2000 Tranquill Agreement.

22.     On or about October 10, 2014, Tranquill resigned his most recent position with the Company as SVP & Group President, Xerox Business Services.

23.     In violation of his pre- and post-employment and confidentiality obligations to Xerox, and on behalf of his new employer, TopBox, LLC, a company in which he is believed to have a significant ownership interest,  Defendant Tranquill has, *inter alia*, set up a business that is and/or will be competing with Xerox for the sale and provision of customer care services, overlapping with one or more of the same services and technologies as those sold and provided by the Xerox business unit which Tranquill headed prior to his resignation from Xerox in October 2014.

24.     By starting a company which offers the above-described customer care services, Tranquill is and will necessarily be using the information acquired by him, and for which he was responsible, as the Group President of the Customer Services Care function for Xerox, and he is and will be competing in the same markets and for the same customers for which he was responsible during his Xerox employment - - including, directly and indirectly, through Defendants Yentis and Timmons.  These activities are and will continue to be in stark violation

of the contractual, trade secret, confidentiality and common law obligations owed by him and by Defendants Yentis and Timmons to Xerox.

25.     In addition, by and through these activities, Tranquill has been, is and will be further interfering with Xerox's rights by acting in conspiracy with the other Defendants in this action to violate the duties owed to Xerox by Yentis and Timmons (and/or other former Xerox employees or third parties acting in concert with Tranquill and the other Defendants in this action).

26.     Tranquill has likewise violated his contractual, confidentiality and trade secret obligations not to solicit or otherwise recruit, or aid in the recruitment of, Xerox employees and Xerox customers to leave Xerox and/or to join or do business with/through Xerox competitors such as TopBox.

**D.      Defendant Jeffrey Yentis**

27.     Defendant Jeffrey Yentis ("Yentis") is Xerox's former Managing Director, Technology Call Centers.

28.     Yentis was hired by a Xerox predecessor, CyberRep, on or about June 26, 2001. In consideration of his employment with CyberRep, Yentis signed a Confidentiality, Non-Solicitation, and Non-Competition Agreement, dated June 26, 2001 (hereinafter, the "2001 Yentis Contract").  Attached hereto and incorporated herein by reference as Exhibit "B" is a true and correct copy of the 2001 Yentis Contract.  Xerox acquired CyberRep in a stock purchase dated on or about January 20, 2003.

29.     On or about September 8, 2014, Yentis resigned his most recent position with Xerox, as Managing Director, Technology Call Centers.  At least five (5) months prior to his resignation from Xerox, Yentis was one of the three (3) "Officers" - - along with Defendants Tranquill and Timmons - - identified in the registration filing of Defendant TopBox, a company

which, as described above, is competing and/or will compete with Xerox for the sale and provision of customer care and related services.

30.     Yentis is believed, and is therefore averred, to have a significant ownership interest in TopBox together with Defendants Tranquill and Yentis.  In his role as an owner and/or principal "Member" of TopBox, Yentis is in a position to compete, and is competing, for the sale and provision of customer care services competitive to Xerox in the same market for which he was responsible in his employment with Xerox, and concerning which he acquired confidential, proprietary, and trade secret information concerning Xerox's business, customers and employees, and where he and Tranquill and Timmons all acquired the benefit of Xerox's goodwill, investment of resources, and development of economically valuable commercial advantages  with respect to Xerox's existing and prospective clientele and services offerings.

31.     In violation of his pre- and post-employment and confidentiality obligations to Xerox, and on behalf of his new employer, TopBox, LLC, Defendant Yentis has, *inter alia*, set up a business that is/will be competing with Xerox for the sale and provision of customer care services, overlapping with one or more of the same services as those sold and provided by the Xerox business unit where Yentis was Xerox's Managing Director of Technology Call Center Services.

32.     As set forth above, the self-described service offerings, "tools," "specialties" and "contact center opportunities" TopBox is marketing to customers correspond to, mirror and compete with those offered by Xerox and marketed by Xerox to its customers.  In their former employment with Xerox, Defendants were responsible for these same functions Top Box itself now describes as its marketing focus, including the strategic development projects associated with "operational and servicing improvements"  Xerox is continuously seeking to develop, refine and offer as valuable service advantages to its customers in these area.  Defendants are now

improperly using the confidential, trade secret, intellectual property and goodwill acquired by them at Xerox to divert Xerox advantages, customers and corporate opportunities to TopBox and to themselves.

33.     By starting a company which offers Customer Care services, Yentis is and will necessarily be using the information acquired by him, and for which he was responsible, as Xerox's Managing Director of Technology Call Center Services, and will be competing in the same markets and for the same customers for which he was responsible during his Xerox employment - - including, directly and indirectly, through Defendants Tranquill and Timmons. These activities are and will be in violation of the contractual, trade secret, confidentiality and common law obligations owed by him to Xerox.

34.     In addition, by and through these activities, Yentis has been, is and will be further interfering with  Xerox's rights by acting in conspiracy with the other Defendants in this action to violate the duties owed to Xerox by Tranquill and Timmons (and/or other former Xerox employees or third parties acting in concert with Yentis and the other Defendants in this action).

**E.      Defendant Brian K. Timmons**

35.     Defendant Keith Timmons ("Timmons") is a former Xerox Senior Vice President of Sales, Telecom & Technology who was employed with Xerox until he resigned his Xerox employment on or about June 30, 2014.

36.     Timmons was hired by ACS, a Xerox predecessor, on or about May 4, 2009.  In consideration of his employment with ACS, Timmons signed an Employee Non-Disclosure, Non-Solicitation and Intellectual Property Agreement dated May 4, 2009 (hereinafter the "2009 Timmons Contract").  Attached hereto and incorporated herein by reference as Exhibit "C" is a true and correct copy of the 1996 Timmons Contract.

37.     On or about June 30, 2014 Timmons resigned his most recent sales position, as Xerox's Senior Vice President of Sales, Telecom & Technology.  Following his resignation, and continuing to the present time, Timmons has been working on behalf of or employed with TopBox, a direct competitor of Xerox, a company in which he has a significant ownership interest as one of its three registered Members (together with Defendants Tranquill and Yentis). In his role as an owner, principal "Member" and sales agent of and for TopBox, Timmons is selling services competitive to Xerox in the same market and/or customers for which he was responsible in his employment with Xerox, and concerning which, like Defendants Tranquill and Yentis, he acquired valuable confidential, proprietary, and trade secret information - - including information to which he gained access, directly and indirectly through Tranquill and Yentis, during the long period after TopBox was formed and TopBox's product offerings were being prepared for sale to Xerox customers during the time when Timmons, Yentis and Tranquill were still holding themselves out as loyal Xerox employees.

38.     In violation of his employment and confidentiality obligations to Xerox, and on behalf of his new employer, TopBox, Defendant Timmons solicited and/or aided in the solicitation of one or more Xerox employees to leave Xerox (including, but not limited to, Defendants Tranquill and/or Yentis) to start up a competing enterprise in which he would be and is now in a position to use the confidential and/or trade secret information learned by him at Xerox to advance Defendants' efforts to divert certain Xerox customers and portions of its business and product innovations to Defendants.

39.     By starting a company which offers Customer Care services, and in conspiracy with Tranquill and Yentis, Timmons will necessarily be using the information acquired by him, and for which he was responsible, as Xerox's Managing Director of Technology Call Center Services, and will be competing in the same markets and for the same customers for which he

was responsible during his Xerox employment - - including, directly and indirectly, through Defendants Tranquill and Yentis.  These activities are and will be in violation of the contractual, trade secret, confidentiality and common law obligations owed by him to Xerox.

40.     These activities have been, are and will be in violation of the contractual, trade secret, confidentiality and common law obligations owed by him to Xerox.  In addition, by and through these activities, Timmons has been, is and will be further interfering with Xerox's rights by acting in conspiracy with the other Defendants in this action to violate the duties owed to Xerox by Tranquill and Yentis (and/or other former Xerox employed or third parties acting in concert with Timmons and the other Defendants in this action).

41.     While still employed with Xerox, Timmons solicited or planned to solicit Xerox customers he serviced and/or for which he was responsible during his Xerox employment and he has sought and threatens to divert directly and indirectly through Defendants Tranquill and Yentis (and other TopBox employees or representatives acting in concert with Defendants the business of these customers to Defendants).

## IV.     FACTS COMMON TO ALL COUNTS

42.     Xerox's customer list and account-related information has been acquired as the result of thousands of account interactions, consultations, interviews, transactions and observations, trial and error, account-by-account revisions and refinements, and is made possible by and acquired through substantial expenditures made by Xerox over a period of many years, including the Company's stock acquisitions of Unitel, CyberRep and ACS, the prior employers, respectively, of Defendants Tranquill, Yentis and Timmons.

43.     Xerox obtained this business and sales information not only through acquisitions, but through advertising, marketing and promotional efforts, by creating and developing sales materials, name recognition, conducting seminars, research and development, responding to

RFPs, honing its product and services demonstration methods and techniques, collectively making thousands of sales and service calls, preparing business and marketing plans and sales proposals, conducting business with and/or for its customers, studying and developing analytics applications, data mining, data recognition, cross-referencing, analysis, evaluation  and solutions concerning service-related processes, communications, problems, patterns, challenges, functions, needs, dynamics, usages, trends, service histories and records, developing computer and information systems, engaging in continuous data collection, retrieval and analysis, compiling, maintaining and integrating data gathering and analysis into the sales process key performance evaluations, service and performance histories and memory reflecting the customers' technology and systems, servicing procedures, workflow, performance evaluations, solutions measurements, processing speed, problem recognition and other specifications and needs.

44.     In addition, this information was acquired and developed by the Company's expenditure of substantial amounts of time and money on travel, entertainment and client development expenses, engaging in a continuous and in depth trial and error process in pursuing customer leads, sales presentation opportunities and the development of analytic models, solutions, applications and processes to facilitate, enhance or create the customers' ability to analyze and integrate their various service and operational needs, and developing many other customer solutions, applications and systems at great expense to Xerox in order to enhance its competitiveness and ability to acquire, secure and maintain its customer base, to develop "take aways" valuable to Xerox's sales model, methodologies and techniques, to profile its customers, to improve and calibrate performance, adapting to constantly changing needs, looking for new and expanded sales and service opportunities, and acquiring valuable account-related information and processes to aid Xerox in its ability to service and grow its base of actual and

prospective customers and to develop the range, effectiveness and appeal of its customer service offerings.

45.     A sales presentation and proposal for any of Xerox's specific existing or prospective customers involves the interplay of a number of different service level specifications, options, capacities, applications, pricing variables, packaging considerations (involving the interplay between price, technologies, applications, service fees, technical support, adaptations, time horizons or other durations, options, contingencies, conditions, and other sales and timing considerations), contract lengths and terms, customer support levels and capacities, past histories, customer usage and workflow patterns, knowledge about the service processes and systems being replaced, upgraded, modeled, refined, improved or otherwise modified, the special functions and needs previously performed (or not performed) by the service processes, software, system, applications or other product, the financial, budget, functionality, business, organizational and/or internal reasons or considerations as to why the customer's prior process was being upgraded, replaced or found wanting, and what the customers' problems, needs, price points, term requirements, location configurations, staffing, logistical issues, inter-departmental, operational, interactive or integration considerations, automation needs, financing arrangements, credit considerations and the like have been in the past and how they might best be served and improved by the present sales proposals or solutions opportunities.

46.     Absent unauthorized disclosure or use, Xerox's competitors have no ability to reconstruct the constellation of detailed sales considerations and variables compiled by Xerox in these respects over a period of many years, especially for accounts where a competitor like the Defendants in this proceeding had no prior or current equipment or systems, no products or services that they developed independently, and had never before designed, developed or paid

for the construction of applications or other analytical tools necessary to integrate into a sales process or strategy.

47.     Creating a successful process, product and sales presentation covering all these many variables, and the key selling points among these customers, would be an extremely difficult, time-consuming and unlikely proposition absent the disclosure or use of the above-described types and the interplay of information, processes, compilation of data, applications, strategies and customer-specific performance criteria and experience acquired by the Defendants in their former positions with Xerox. Defendants, solely as a result of their being former Xerox employees are in a position to use, and will implicitly and unavoidably use, this compilation of information, methods and applications, on behalf of a startup competitor like TopBox.  However, because the business of these customers had been established and developed under Xerox's care and through Xerox's massive investment of resources over a substantial period of time, and because Xerox developed this valuable information, as well as its substantial relationships and goodwill with these specific customers (handled by Xerox's tightly knit and closely-interacting pre-sales, sales and technical team members), Xerox has a significant sales and economically valuable advantage that its competitors simply could not begin to duplicate, if ever they could, without investing very substantial amounts of money and many years of independently-invested time, trial and error, effort and expense.

48.     Xerox's customer account histories, for example, involve a complex relationship involving many detailed variables and considerations.  The sales proposals Xerox has made to the customers that TopBox now seeks to divert consisted of valuable, confidential and proprietary information that could only have been developed after Xerox had spent significant resources in obtaining, analyzing, coordinating and developing past account and sales information and developing processes and applications based thereon.  While at Xerox,

17

Defendants acquired intimate knowledge concerning a substantial amount of detailed and confidential account information including, but not limited to, customer processing, servicing procedures, capacities, methods and performance criteria, the customer's preferences, needs, priorities, business plans, budgets, objectives and special business and organizational considerations; software and equipment specifications; configurations between the customer's different systems, software and equipment; the relationship between different departments, offices, customers and/or end users, levels of interactivity, automation and functionality; price and discount information; volume and usage data and histories; customer likes and dislikes; past communications reflecting customer inquiries, product and communications concerns, products, upgrades or works-in-progress, parameters, requests for proposals, quotes and product capabilities; software versions, software capacity, upgrade options, technological innovations, coordination of technologies, introduction of new technology, and functionality objectives; the customer's business cycles, schedules, buying patterns and purchasing considerations; business characteristics relevant to the business of that customer and/or the priorities of their purchasing representatives, management, and/or end users; credit and payment terms, payment schedules, financing considerations and past credit histories; customer complaints, ease-of-use issues, problems, and the perceived strengths and weaknesses of Xerox's performance and standing with the customer, the reasons therefor, and the development of proposed terms and strategies to take advantage of the strengths, refine the service methodologies and techniques, resolve the vulnerabilities, etc.; and numerous other applications, data utilization, cross-referencing, evaluation and processing developments taking customer characteristics and procedures into account and through which the Company can attract, problem solve, impress and engage the customer, and otherwise facilitate meeting the customers' service needs and crating value-added services attractive to the Company's customers.  This applies to all of the customer accounts,

18

sales strategies and sales opportunities to which Xerox had devoted a massive amount of time, effort and expense over the years and for or concerning which Defendants had direct or indirect knowledge and involvement, and concerning which methodologies, information, and applications Defendants can and will implicitly and inevitably use to develop and inform TopBox's service methodologies, service applications, templates, database and strategies.

49.    While at Xerox, the Defendants' roles and responsibilities were to work in collaboration with the Company's sales and service engagement teams, to build and strengthen the Company's service offerings, to build and maintain strong customer relationships, and to work to insure the successful implementation of the company's customer projects and new product offerings beginning with the planning stages and continuing on subsequently through to and including its actual "live" implementation, ongoing service and continuing refinements, pilot trial runs, upgrades and development stages.

50.    These roles further required Defendants to become intimately familiar with Xerox's services, development plans, applications, margins, customers' systems, functions and utilizations, performance parameters, customer satisfaction levels, and strategies for upgrading Xerox's services among its customers, and to thereby extend the company's goodwill, reputation and customer relationships.  It also required Defendants, in varying degrees, to become highly familiar with the broad range and performance of services and functionality of the company's software, technical services, service and product offerings, range of possible applications and utilities, and to assist in adapting these services to achieve greater customer satisfaction and appeal, more efficient, integrated and improved services, and improved sales and marketing strategies.

51.    Throughout the term of their employment with Xerox, Xerox paid all necessary and appropriate business expenses relating to Defendants' business activities, provided them

with abundant sales and service opportunities, and provided them with all agreed, reasonable, available and/or necessary Xerox support personnel, benefits, operational systems, financial management, services offerings, product inventory, administrative bookkeeping, business and expense support, and servicing infrastructure at all times.

52.     Further, Xerox provided Defendants with staff and administrative services, sales assistance, product and market research, technical research and support, the benefit of Xerox advertising, goodwill and name recognition, the use of experts and highly trained software and computer technicians, product maintenance, servicing and support, networking access, business systems, integrated solutions, hardware and software products, technology training, computer systems, office technology products and services, specialist support, and otherwise provided them with promotional, marketing, product and sales support.

53.     In addition to the foregoing, Xerox provided Defendants with new service strategies and technologies, products and upgrades to market and/or to apply to new and existing customers, and provided them with the ability and standing to identify, acquire, further penetrate, and develop new and pre-existing accounts and opportunities generated and facilitated by and through their access to, supervision over and/or use of Xerox's resources, products, technology, software, support, investment, expense, goodwill, name recognition, reputation, promotions, and national and/or local marketing and advertising efforts and materials.

54.     In their respective roles as Xerox's Group President, Managing Director, Technology Call Centers, and Senior Vice President of Sales, Telecom &Technology for the Company's customer care business, Defendants became intimately familiar with all aspects concerning Xerox's customer accounts and service offerings for which they were responsible, as well as those assigned to other Xerox sales, consultant, service, technical, project development

and support representatives with whom they came into regular contact in their supervisory and/or sales-related roles as Xerox senior management.

55.     In their senior management and sales roles, Defendants were responsible for product development and required to communicate Xerox's technologies and services to the service engagement team to achieve Xerox's business goals and the customers' business and services objectives; to implement Xerox processes and standards as they relate to the needs of the Company's customers; and to develop and leverage consistent and repeatable practices and processes that could be used and where results could be duplicated in Xerox's delivery models for use with other customers and potential customer locations.  Of critical importance, Defendants were responsible for developing and/or improving Xerox's strategies, applications, policies, processes and best practices for the delivery and sales of these refined methodologies and use with Xerox customers and potential customers.  The development of new and saleable value-add applications and functions, which includes the innovative development, use and application of analytics technology, is important in the competitive customer care business environment in order to maintain current customers and attract new customers.

56.     Accordingly, through the exposure they acquired in their employment in these roles with Xerox and its predecessor companies, Defendants became the repository of many years of valuable and confidential information, goodwill and investment built up by or through Xerox and/or on Xerox's behalf.  As a result of the high level access provided to them in their roles as SVP/Group President, Managing Director, Technology Call Centers, and Senior Vice President of Sales, Telecom & Technology in and for the Company's Customer Care business unit,  Defendants could and did identify and implement strategic methodologies, trends, applications under development, marketing plans and the performance metrics applicable to acquiring and maintaining a competitive marketplace advantage, and how those strategies and

applications can be used for and marketed to Xerox's key customers.  These are strategies, innovations and applications that Defendants can now divert and confer upon themselves and TopBox, and represent the "tools", specialties" and "opportunities" that TopBox, as described above and in its own social media, is now marketing in competition with Xerox, including to one or more Xerox customers.

57.     Defendants' roles at Xerox regularly involved and engaged them with the needs and processes of Xerox's customers, and required them to learn, develop and apply Xerox's service and sales strategies for meeting their needs, for refining the functionality and operation of customers' service methodologies and systems, and for modifying or upgrading Xerox's service offerings and capabilities, designs and technologies, including the implementation or planning of solutions currently available and those under development or in the planning stages.  In their supervisory and/or sales roles, Defendants learned valuable information concerning what products, systems and features were more (or less) user-friendly, more (or less) saleable and appealing, more (or less) compatible with existing or anticipated customer technologies, more (or less) popular with or attractive to various customer internal populations or users, were more (or less) consistent with the customers' future needs, desired objectives and marketing brand, what could be cost-effective or otherwise deliver desirable efficiencies and value-added benefits to customers, or what required refinement or further development, all of which information, intelligence, information and considerations provided valuable economic advantages to Xerox not just in its service engagement and familiarity with customers' software systems, but also in its strategic product development efforts, service and product planning.

58.     The use, processing and development of this compilation of information was a key part of Defendants' jobs and is vital to the design and success of Xerox's strategic sales planning, sales presentations to and relations with its customers, to programing and coordinating

methodologies for the servicing of customer accounts, the design of improvements to existing products, applications and systems, and to efforts to acquire new or additional business from new or existing customers.

59.     All of the sales, development and customer account information to which Defendants were exposed and otherwise gained access in their capacity as a Xerox 's SVP/Group President, Managing Director, Technology Call Centers, and Senior Vice President of Sales, Telecom & Technology in and for Xerox's customer care service business, and all of the account and sales information associated therewith, was acquired, generated, developed, serviced, or learned by Defendants through their employment at Xerox or on Xerox's behalf.

60.     In their confidential capacities as a  Xerox SVP/Group President, Managing Director, Technology Call Centers, and Senior Vice President of Sales, Telecom & Technology, respectively, Defendants each contributed valuable confidential information learned from and in interaction with customers to analyze, process, incorporate into and develop Xerox's sales and service strategies, growth and customer retention plans, research and development and sales materials, software revisions and all of this information informed the process by which future product planning, sales and development efforts were conceived, created, evaluated and designed.

61.     Further, Defendants also learned the key terms and variables relevant to Xerox's software and technological systems, and the collective feedback and processing of information concerning the satisfaction levels and needs of its customers, all of which are key variables relating to designing new processes, products and applications and  thereby gaining, developing or retaining existing customers and/or acquiring new customers and/or new sales opportunities.

62.     Defendants also acquired access to, use of, and familiarity with Xerox's solutions, sales and marketing strategies, pricing and packaging structure, schedules and strategies, product

design and initiatives, next generation product plans, functionality objectives, field performance,

user feedback, studies, surveys, problems and other considerations concerning interactivity with

other systems or functionalities, the extent of customers' product or systems integration, price

and discount policies, future business plans, evaluations and strategies, sales and product

modeling and upgrades, training techniques, strengths and weaknesses with specific reference to

its specific existing and/or prospective customers, and the design of the Company's sales focus

and value added propositions for use in obtaining new business, including the growth of business

and product lines with current customers, penetrating the business of new customers, or

otherwise expanding the level of its products or services to pre-existing customers, and a wide

range of profitability and cost considerations.  All of this business, sales, product and customer-

related information provides Xerox with a significant economic advantage or "head start" over

its competitors who have not compiled this matrix of information and the ability to cross-index

or cross utilize this information or build upon the architecture and options for integrated use that

it creates.

63.     These are advantages that apply directly to the competitive standing and activities

of Defendants in their new positions with TopBox.  In their new venture, Defendants cannot help

but use this information and these advantages for the benefit of a Xerox competitor that has, by

Defendants' actions, made known its intent to sell and compete for the sale of customer care

services business, which necessarily implicates the customer base and market share of Xerox.

Defendants' knowledge of Xerox's strategic customer, service, sales, product and

research/development information, and its strategies, product application plans and

methodologies that have been developed as a result.  This is exactly the kind of commercially

valuable information that an opportunistic competitor such as TopBox - - especially in its efforts

to copy Xerox customer information, products, strategies, applications, research and

development projects, and other account-related or strategic information relating thereto - - to unfairly seek to the known needs of any given Xerox customer Defendants choose to target - - to divert Xerox customers and market share by using Xerox assets in which Defendants have invested none of the years of  time, effort and expense that Xerox has invested., including by its support of Defendants' former work as Xerox senior executives.

**The Individual Defendants' Specific Contractual Obligations to Xerox**

64.     At the time Tranquill, Yentis and Timmons, respectively, commenced their employment with Xerox or, more specifically, a Xerox predecessor, and in consideration of their respective employment, continued employment and/or acceptance of promotions, the individual Defendants each signed agreements containing certain continuing and post-employment confidentiality and restrictions against engaging in activities that would harm Xerox as a result of the position, advantages and information they had acquired at Xerox and at Xerox's direct and indirect expense.  See Exhibits "A through "C," attached hereto.  The individual Defendants also signed various other substantially similar, intervening, complementary and/or otherwise applicable agreements at various times during their employment with Xerox and/or its predecessors.

65.     As set forth above, Xerox provided valuable consideration to Tranquill, Yentis and Timmons for the contractual promises to which each agreed, and Xerox has satisfied all conditions precedent.

*Defendants' Obligation Not to Use or Disclose*
*Xerox Xerox's Confidential, Proprietary, or Trade Secret Information*

66.     The terms, conditions, and provisions of Tranquill's, Yentis' and Timmons' agreements acknowledge that they each would acquire and gain access to confidential, proprietary, and/or trade secret account and sales information.

67.     In the agreements signed by Tranquill and Yentis, for example, they each agreed to keep and retain that information in confidence, and not to disclose or use that information "either during or after" their employment, as follows:

## Confidentiality

**Section 1.**

a.      As used in this Agreement, "<u>Confidential Information</u>" shall mean <u>all systems, processes, strategies, computer programs, business plans, business ideas and concepts</u>, project data, scripts and other information; all employee, <u>sales and marketing information</u>, including, but not limited to <u>employee lists and customer lists</u> (past and present); all information on prospects, past and present; all financial information, correspondence, legal documents, files, <u>internally or externally generated compilations, studies, notes or other information and know how</u>, whether or not in writing, of a private, secret or confidential nature <u>concerning the business or financial affairs or business methods of CyberRep</u>, regardless of whether such information is specifically labeled as "proprietary" or "confidential."

b.      <u>Employee shall not disclose any Confidential Information</u> to others outside of CyberRep (except as part of Employee's performance on behalf of CyberRep), or use the same for any unauthorized purpose, without the prior written approval by CyberRep, <u>either during or after Employee's employment</u> with CyberRep unless such Confidential Information has become public knowledge without fault of the Employee.

c.      Employee agrees that all tangible material containing the Confidential Information, whether created by Employee or others, which shall come into Employee's custody or possession during the term of Employee's employment, shall be and is the exclusive property of CyberRep to be used by Employee only in the performance of Employee's duties for CyberRep, and to be returned to CyberRep immediately upon termination of Employee's employment or appropriate reimbursements will be deducted out of final paycheck.

<u>See</u> Exhibits "A" and "B," attached hereto, at ¶ 1 (emphasis added).

68.     Defendant Timmons likewise agreed to maintain and preserve the confidentiality of the information he acquired access to in his employment, and both "at all times during and after" his employment with the Company,  as follows:

> 1.     Confidential Information.  At all times during and after my employment with the Company I will hold in strict confidence and will not disclose, publish or use, directly or indirectly, for my benefit or the benefit of others, any Confidential Information of the Company, except as the disclosure, use or publication is required in connection with my work for the Company, or unless an officer of the Company expressly authorizes that use or disclosure in writing.  "Confidential Information" means information in any form that may be disclosed to me by the Company or which I may otherwise learn during the course of my employment that relates to the business of the Company or any customer or supplier of the Company or any other party with which the Company agrees to hold information of that party in confidence.  Confidential Information includes, but is not limited to, technical information, marketing and business strategies, product plans, business processes and techniques, lists of suppliers, customer names and requirements, pricing and bidding strategies and techniques, financial data, personnel information regarding the skills and compensation of other employees of the Company, personally identifiable information about any individual, and "Intellectual Property" (as defined below).

*See* Exhibit "C" hereto; Timmons 2009 Contract, at Sec. 1.  Defendants have also been provided with, and have signed acknowledgements for, confidentiality obligations contained in the Company's Code of Business Conduct.  Attached hereto and incorporated by reference as Exhibit "D" is a true and correct copy of excerpts from the Xerox Code of Business Conduct by which each Defendant agreed to be bound.

### *Defendants' Obligation Not to Compete and Not To Solicit Xerox Customers*

69.     Defendants Tranquill and Yentis specifically agreed in their Confidentiality, Non-Solicitation and Non-Competition Agreements not to solicit customers (or employees) having contractual relationships with the Company as follows:

**Section 2.**     **Non-Solicitation**

During the term of the Employee's employment with CyberRep, and the next succeeding twelve (12) months, Employee shall not, directly or indirectly:  (1) solicit or induce, or attempt to induce, any other person or entity having any continuing or periodic contractual relationship with CyberRep (including, but not limited to an employment relationship) to terminate, reduce or materially alter their relationship with, or otherwise cease negotiations and/or business activity with, CyberRep; or (2) solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any persons who had a contractual relationship with CyberRep or with whom CyberRep was involved in negotiating any relationship within six (6) months of the effective date of termination.

See Exhibits "A" and "B" hereto, at Sec. 2 (emphasis added).

70.     The agreements signed by Defendants Tranquill and Yentis further specified that,

in the event of their termination, they would not compete with Xerox for a period of one year.

Specifically, the non-compete provisions in the contracts to which Defendants Tranquill and

Yentis agreed provide as follows in this respect:

**Section 3.**     **Non-Competition**

Employee agrees that, during the term of this Agreement and for one (1) year from the date of the termination of Employee's employment with CyberRep, Employee shall not, directly or indirectly engage in competition with CyberRep in any manner or any phase of the business which is being conducted by CyberRep during the term of Employee's employment, including the systems related to the products or services being sold by CyberRep, without CyberRep's prior written consent, whether alone or as a partner, officer, agent, joint venturer, investor, lender, director or stockholder (except as a less than 10% shareholder of a publicly-traded corporation), or as a consultant, advisor or employee, or otherwise, of any other entity or individual in the United States which is in the same or substantially similar business as CyberRep or CyberRep's affiliate or parent.

See Exhibits "A" and "B," attached hereto, at Sec. 3 (emphasis added).

*Defendants' Obligation Not to Solicit or Recruit Xerox Employees*

71.     In each of their Confidentiality and Non-Compete Agreements, each of the individual Defendants also agreed that they would not solicit or recruit Xerox employees to leave the Company's employment.  This obligation is set forth in Section 2 of the non-solicitation provisions of the Tranquill 2000 Contract and the Yentis 2002 Contract prohibiting the solicitation of any person in a "contractual relationship" with the Company, a restriction that is expressly defined to apply to persons in "an employment relationship" with the Company.   See Exhibits "A" and "B", Tranquill Contract and Yentis Contract, at Sec. 2.

72.     Tranquill and Yentis effectively agreed to this restriction against soliciting for hire or hiring Xerox employees in two different respects:  (a) by their 12 month post-employment agreement not to compete "in any manner or any phase of the business" of Xerox; and (b) by their agreement "during" and for the succeeding twelve (12) months following their employment, not to "solicit or induce, or attempt to induce any other person . . . to terminate, reduce or materially alter their relationship" with the Company - - specifically including any person in "an employment relationship"  with the Company.  See Exhibits "A" and "B", Tranquill 2000 Contract and Yentis 2001 Contract, at Sec. 2 and Sec. 3 (emphasis added).

73.     In the Timmons 2009 Contract, this obligation not to solicit Xerox employees to leave the Company's employ is set forth as follows:

> 6.     Non-solicitation of Employees.  During the period of my employment and for a period of twelve months following the date of the termination of my employment with the Company, I will not, on my own behalf or on behalf of any other person or business entity, hire, solicit, seek to hire, or offer employment to any person who is, during that period, an employee of the Company, or in any other manner attempt, directly or indirectly, to influence or encourage any employee of the Company to leave the employment of the Company.

See Exhibit "C", Timmons 2009 Contract, at Sec. 6.

74.     As set forth herein, and notwithstanding these obligations, Defendants each, both alone and acting in concert with one another (pending discovery and further investigation), violated these promises not to solicit Xerox employees to leave the Company - - including as it applies to their obligation not to directly or indirectly seek to influence, encourage, induce, or otherwise solicit one another to leave the Company's employ.

*Defendants' Agreement to Injunctive Relief*

75.     Defendants Tranquill and Yentis each further stipulated and agreed that the Company had the right to seek entry of injunctive relief against them to ensure their compliance with the obligations set forth in their respective contracts:

> **Section 4.     Miscellaneous**
>
> a.     The restrictions contained in this Agreement are necessary for the protection of the trade secrets, proprietary information and contractual relationships of CyberRep, all of which Employee acknowledges may be disclosed to Employee while in CyberRep's employ, and are considered by Employee to be reasonable for such purpose.  Employee agrees that <u>any breach of this Agreement will cause CyberRep substantial and irrevocable damage</u> and therefore, in the event of any such breach, <u>Employee agrees that, in addition to any other remedies that may be available, CyberRep shall have the right to seek specific performance and injunctive relief, without the need to post a bond or other security</u>.

<u>See</u> Exhibits "A" and "B," attached hereto, at Sec. 4 (emphasis added).

76.     Xerox further believes, and therefore avers, that Defendants Tranquill, Yentis and Timmons will unavoidably. necessarily, and implicitly use, draw or rely upon, compromise and thereby misappropriate Xerox's confidential sales, business, product development, customer list and account information and that this will cause the loss of competitive advantage and the diversion of the goodwill of Xerox customers, undermine and injure Xerox's goodwill with its

customers, and will otherwise operate and lead to them diverting to themselves, and to TopBox,

Xerox's trade secret information and advantages, goodwill, account information, and revenues.

77.     Upon information and belief, Tranquill, Yentis and Timmons have used, will use,

draw or rely upon, and/or otherwise misappropriate, and/or will necessarily and inevitably use,

rely upon and/or otherwise misappropriate, valuable Xerox customer information, for the benefit

of a Xerox competitor, TopBox, including by using this information to develop competing

service care offerings, applications and competing services to divert Xerox customers and sales

opportunities to TopBox.

78.     Defendants have continued to engage in, are preparing to engage in, and/or are

continuing to engage in, *inter alia*, the following acts:

(a) soliciting and/or preparing to solicit Xerox's customers, who were assigned to

the individual Defendants or otherwise under their supervisory management, control,

and/or responsibility while they were employed by Xerox, or about whom they learned

confidential sales or account-related information while at Xerox, and seeking to have

those customers terminate or diminish their relationship with Xerox and conduct business

with and/or through Defendants;

(b) converting the information, by their use and capitalization thereon, contained

in confidential and trade secret Xerox business records, specifically including the

technology design, past and present product and services under development, sales

strategies, current and planned service offerings, accumulated customer information,

sales and service data analytics and other applications, client list information, trial

services, program developments, pilot programs, customer terms, performance status and

criteria, business dealings, purchasing requirements, pricing strategies and terms, policies

and information, sales proposals, volume and discounting variables, customer contract

terms, transaction histories, marketing plans, product specifications, customer preferences

and needs, packaging arrangements, timing considerations, systems configurations,

Xerox contract and/or bid terms, training techniques and strategies, and/or other

confidential account-related information concerning the customers the individual

defendants serviced, supervised, and/or with whom they had material contact at Xerox;

(c) improperly using and/or sharing verbally, in writing, by their formation of

TopBox, by their sales product design and marketing activities, and to or on behalf of

Defendant TopBox, the customers' names, addresses, customer contract and account-

related information, sales opportunities, pricing and other commercially valuable

information contained in the records of Xerox and described hereinabove;

(d) other such acts contrary to the terms, conditions, and provisions of the

individual Defendants' Agreements with and obligations to Xerox (see Exhibits "A," "B"

and "C" attached hereto), and Xerox's trade secret, property, intellectual property,

proprietary, and other rights.

## V.   INJUNCTIVE RELIEF

79.     Plaintiffs incorporate by reference the preceding paragraphs as if set forth herein

in their entirety.

80.     By virtue of the foregoing, Xerox has demonstrated a likelihood of success on the

merits and that a balancing of the equities favors the issuance of an injunction against

Defendants.

81.     Unless Defendants are temporarily and preliminarily enjoined from the foregoing

conduct, Xerox will be irreparably harmed by:

(a) Disclosure of trade secrets, research and development products,

applications, services and plans, sales strategies, customer lists, business methods,

compiled data and accumulated customer and sales feedback and survey information, and other confidential information which are solely the property of Xerox and its clients;

(b) Loss of confidentiality of the information contained in Xerox's records, loss of confidentiality of Xerox's and its customers' business and financial dealings, loss of confidence and trust of customers, loss of customers' goodwill, and loss of business reputation, standing and advantages; and

(c) Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

82.     Xerox has no adequate remedy at law.

WHEREFORE, Xerox respectfully requests that:

(a) Defendants be immediately enjoined and restrained, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee, and/or representative of Defendant TopBox, until hearing and thereafter until further Order of the Court, from doing any of the following:

(i) competing with Xerox for the sale or provision of any customer care products, services, or offerings;

(ii) soliciting or attempting to solicit business for the servicing or sale of products or service offerings similar to or competitive with those sold by Plaintiffs for any customer of Xerox for whom Defendants Tranquill, Yentis or Timmons had any dealings and/or responsibility and/or account-related information at any time during their last two years of employment with Xerox and, further, from accepting any business from or doing business with any of said customers Defendants have has solicited prior to entry of an Order by the Court prohibiting further solicitation or shared information and business activities;

(iii) using, disclosing, or transmitting for any purpose, including for the purpose of soliciting or preparing to solicit Xerox customers, the information contained in the records of Xerox, including, but not limited to, product or design information, sales or business strategies, customer or customer account information, information concerning Xerox's marketing, pricing, products under development, research, software design, analytics applications, survey or survey information, volume or discount terms, packaging and product information, servicing terms, contract expirations, product specifications, customer preferences, transaction histories, customer plans and inquiries, sales proposals, profitability considerations, systems and solutions' configurations, distribution, delivery, vendor network information, and other business strategies and information;

(iv) that Defendants be prohibited from engaging in any and all competitive sales-related activities, customer contacts, and conduct of business with any Xerox customer for whom they had direct or indirect responsibility in their employment with Plaintiff;

(b)     that Defendants and anyone acting in concert or participation with Defendants, including any agent, employee, officer, or representative of Defendant TopBox, be further ordered to return to Xerox any and all information pertaining to Xerox's business, service offerings, research and development products, projects or plans, analytics applications, call center strategies, customer care strategies, customers, their business dealings, Xerox's business methods or strategies, prices, packaging, profitability, sales representatives, contract terms or lengths, past transactions, customer plans, past inquiries and communications, marketing strategies, applications design or

configurations, volume usages, performance data, service or product specifications,

customer preferences, and/or other confidential business information, whether in original,

copied, computerized, electronic, stored, handwritten, or any other recorded,

electronically or other stored, memorized or reproduced form, and otherwise purge any

such information from their possession, custody, or control within 48 hours of notice to

Defendants or their counsel of the terms of the Court's Order, provided, however, that

any information so purged shall be preserved, imaged and printed prior to purging for

return unaltered to Xerox in said form pursuant to the preceding terms of this paragraph.

## COUNT I

## BREACH OF CONTRACT
## (AGAINST DEFENDANTS TRANQUILL, YENTIS AND TIMMONS)

83.     The allegations of Paragraphs 1 through 82 are incorporated herein by reference

with the same force and effect as if set forth in full below.

84.     The employment agreements of each of the individual Defendants herein entered

into with Xerox were properly obtained for the legal purpose of protecting Xerox's legitimate

business interests including, but not limited to, Xerox's trade secrets, other valuable proprietary

and confidential business information, Xerox's goodwill and relationships with actual and

prospective Xerox customers, and the stability of Xerox's workforce.  See Exhibits "A" through

"C" attached hereto.

85.     As explained more fully above, Xerox provided consideration for each of these

agreements with Xerox.  *See* Exhibits "A" through "C" attached hereto.

86.     Xerox has satisfied all conditions precedent to receive performance by each of the

individual Defendants of their obligations to Xerox under each of the said individual Agreements

attached hereto and incorporated herein by reference.  See Exhibits "A" through "C" hereto.

87.     As explained more fully above, each of the individual Defendants have violated the terms of their Agreements with Xerox both during and after the term of their employment with the Company.  See Exhibits "A" through "C" attached hereto.

88.     As a consequence of the foregoing, Xerox has suffered and will continue to suffer irreparable harm and loss.

## COUNT II

### BREACH OF EMPLOYEE DUTY OF LOYALTY
### (AGAINST DEFENDANTS TRANQUILL, YENTIS AND TIMMONS)

89.     The allegations of Paragraph 1 through 88 are incorporated herein by reference with the same force and effect as if set forth in full below.

90.     Defendants Tranquill, Yentis and Timmons each held employment positions with Xerox that obligated them at all times to act in the best interest of their principal and without conflict of interest.  This included the duty to advise their employer of any activity, information event, or other matter known to them concerning their own performance and/or the employer's business that could have an adverse effect on their employer.

91.     In their respective roles with Xerox, Tranquill, Yentis and Timmons had access to and use of the Company's confidential and trade secret information and access to and use of the Company's goodwill with its customers.  As such, and in their capacities senior management and/or sales representatives, Tranquill, Yentis and Timmons held positions of trust and were obligated at all times to act in Xerox's best interest, to act without conflict of interest, and to safeguard and protect the confidential and/or trade secret information, customer relationships, and economically valuable advantages and assets of the Company, and to otherwise protect the Company's best interests, to fully and faithfully disclose matters of potential concern to the Company relating to and/or in connection with the performance of their duties, and to otherwise protect the Company from harm.

92.     Tranquill, Yentis and Timmons, by their actions, failed in and violated their duty of loyalty to Xerox.

93.     Tranquill's, Yentis' and Timmons' actions were conducted by them without privilege, justification or authority.

94.     To the contrary, Tranquill, Yentis and Timmons conspired with one another, and with one or more third parties including TopBox, to inflict harm and injury upon the Company and withheld important information concerning the performance of their duties, their recruitment of Xerox employees to engage in competitive activities both during their employment with the Company and while advancing the interest of a Xerox competitor consisting of Xerox employees, compromising and diverting to themselves the relationship and future business prospects of the Company with its customers and its employees, compromising the protection of confidential and trade secret company information, and engaging in the diversion of the Company's corporate opportunities.

95.     As a consequence of the foregoing, Xerox has suffered and will continue to suffer irreparable harm and loss, and this harm and loss is continuing in its consequences and effect through and including the present time, for which the Company is seeking damages, including, but not limited to, disgorgement of Defendants' salaries and other compensation, and injunctive and other relief to remedy and offset the harm inflicted by Defendants.

## COUNT III

## MISAPPROPRIATION OF TRADE SECRETS
### (AGAINST ALL DEFENDANTS)

96.     The allegations of Paragraphs 1 through 95 are incorporated herein by reference with the same force and effect as if set forth in full below.

97.     As described more particularly in the foregoing, the books and records of Xerox, the confidential customer list and account-related information contained therein, including the

identity of Xerox customers, their names and addresses, agents and account managers, business and financial dealings, the transactions in their Xerox accounts, purchasing requirements, purchasing history and patterns, servicing terms and conditions, service agreement lengths, expirations and terms, equipment configurations, customer plans, preferences, and communicated needs, sales and corporate opportunities, profitability considerations, Xerox's strengths and weaknesses with its customers, and other business and financial information concerning Xerox services and products, research and development projects, analytics applications, past and planned product and services offerings, project status, performance results, program developments, pilot and trial run performance results, prices, pricing schedules, profitability considerations, marketing strategies, costs, techniques, service methods and systems, and/or other market considerations, are trade secrets subject to trade secret protection, including under the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-51 et seq., and relevant precedents and standards established thereunder.

98.    Defendants knew or had reason to know that they acquired this information under circumstances giving rise to their duty to Xerox to maintain the secrecy of this information and/or to limit its use.

99.    This information is a compilation of information that derives independent economic value, actual or potential, by not being accessible, through proper means, to competitors, such as the Defendants and their new employer, TopBox, who can profit from its explicit and/or implicit and/or intentional and/or inevitable disclosure or use.

100.    Xerox has undertaken measures and efforts that are reasonable and adequate under the circumstances to maintain the secrecy of this information.

101.    The foregoing conduct of Defendants Tranquill, Yentis, Timmons and TopBox and their use of and reliance upon information acquired by them in their years of management

38

access thereto and responsibility therefor at Xerox to compete with Xerox through Defendant

TopBox constitutes an actual, planned, implicit and/or unavoidable and inevitable

misappropriation and misuse of Xerox's confidential and trade secret information, without

authorization, in violation of the foregoing statutes and authorities.

102.    As a consequence of the foregoing, Xerox has suffered and will continue to suffer

irreparable harm and loss.

### COUNT IV

### TORTUOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (AGAINST ALL DEFENDANTS)

103.    The allegations of Paragraphs 1 through 102 are incorporated herein by reference

with the same force and effect as if set forth in full below.

104.    Defendants Tranquill, Yentis and Timmons, whether acting alone and/or in

concert with one another and with TopBox, have intentionally sought to interfere with the

performance of the contractual obligations owed by Tranquill, Yentis and Timmons to Xerox.

105.    Defendants' actions have been and are being taken deliberately and without

privilege or justification.

106.    As a consequence of the foregoing, Plaintiff has suffered and will continue to

suffer significant harm and loss.

### COUNT V

### INTERFERENCE WITH ACTUAL AND PROSPECTIVE BUSINESS RELATIONS
### (AGAINST ALL DEFENDANTS)

107.    The allegations of Paragraphs 1 through 105 are incorporated herein by reference

with the same force and effect as if set forth in full below.

108.    Defendants Tranquill, Yentis, Timmons and TopBox have intentionally interfered

and/or are planning to interfere with Plaintiff's actual business relationships and/or those

business relationships into which Xerox has a reasonable probability of entering, including, but not limited to, the solicitation of customers that the individual Defendants formerly serviced, supervised or learned in their former employment with Xerox.

109.     Defendants have engaged in such interference without justification, and by the utilization of improper means, including, *inter alia*, by actually and/or implicitly using Xerox confidential customer list, account, and sales information; by breaching their restrictive covenants and other contractual obligations to Xerox; by diverting the goodwill of Xerox customers in the same sales territory and with respect to the same customers for which they were responsible at Xerox for an improper purpose, including the solicitation and diversion of Xerox customers and the use of customer goodwill for the benefit of a competitor; by violating Xerox's statutory trade secret rights; by soliciting and hiring Xerox employees with the use of trade secret information and in violation of their contractual obligations; by conspiring with one another and by otherwise using, both actually, affirmatively, implicitly, unavoidably and inevitably, confidential and trade secret information concerning Plaintiff's customers for the benefit of a Xerox competitor to obtain an improper competitive advantage.  These acts were committed for a period of at least eleven months while one or more of the individual Defendants was employed at Xerox, and is continuing following the time Tranquill, Yentis and Timmons resigned their Xerox employment, the last of which resignations took place on October 10, 2014.

110.     Defendants are interfering and/or plan to interfere with the actual and prospective contractual relations between Xerox and one or more of  its customers, including, but not limited to, certain key customers served by Defendants in their former Xerox employment, and, upon information and belief, Defendants have planned on/or acted to solicit and divert the business of additional Xerox customers, with and through the use of misappropriated Xerox information.

111.    As a consequence of the foregoing, Plaintiff has suffered and will continue to suffer significant harm and loss.

## COUNT VI

## UNFAIR COMPETITION
### (AGAINST ALL DEFENDANTS)

112.    The allegations of Paragraphs 1 through 111 are incorporated herein by reference with the same force and effect as if set forth in full below.

113.    Defendants' use, disclosure and/or misappropriation of Plaintiff's confidential and trade secret information, Defendants' deliberate and intentional violation of the employment agreements terms and obligations to Plaintiff, recruitment of other Xerox employees as part of an ongoing conspiracy to misappropriate confidential and trade secret Xerox information and corporate opportunities, and/or Defendants' solicitations and methods of solicitation and diversion of the business of Plaintiff's specific existing and/or prospective customers, comprise improper means of seeking to compete and, both individually and collectively, constitute acts of unfair competition.

114.    Defendants' acts of unfair competition have been committed or engaged in without privilege or justification, were and/or are being committed through improper means and for an improper purpose, and have proximately caused injury to Plaintiff, specifically including immediate and irreparable harm for which there is no adequate remedy at law.

115.    As a consequence of the foregoing, Xerox has suffered and will continue to suffer irreparable harm and loss.

**WHEREFORE,** by virtue of the foregoing acts complained of above and by reference in Counts I, II, III, IV, V and VI, Xerox demands judgment in its favor and against Defendants for temporary, preliminary and/or permanent injunctive relief, together with damages for all violations and breaches of Xerox's rights, exemplary damages based thereon, punitive damages,

attorney's fees, and all such other and further relief and remedies as are justified by the evidence presented at the hearings and ultimate trial in this proceeding.

Respectfully submitted,

Dated: March 16, 2015            By:    _Elizabeth M Lacombe_

*Attorneys for Plaintiffs*
*Xerox Corporation and*
*Xerox Business Services, LLC*

Elizabeth M. Lacombe (Bar No. ct 28352)
Duane Morris LLP
100 Pearl Street, Suite 1415
Hartford, CT 06103
Phone: 215-979-1577
Fax: 207-470-4287

Michael R. Gottfried
Duane Morris LLP
Suite 500
470 Atlantic Avenue
Boston, MA 02210-2243
Phone: 857.488.4212/4290
Fax: 857.488.4201

Of Counsel:

Thomas T. Loder
Lawrence H. Pockers
Duane Morris, LLP
30 South 17th Street
Philadelphia, PA 19103
Phone: 215-979-1246/1153
Fax: 215-979-1020

# EXHIBIT A

# CONFIDENTIALITY, NON-SOLICITATION, AND NON-COMPETITION AGREEMENT

This Confidentiality, Non-Solicitation and Non-Competition Agreement ("Agreement") is made as of the ____ day of _____, 20___, by and between CyberRep Corporation ("CyberRep") and Employee ("Employee").

Whereas, as part of Employee's position with CyberRep, Employee will be provided with extensive training by CyberRep, as well as access to certain proprietary and confidential materials and information owned by CyberRep, CyberRep's assigns, customers and clients; and

Whereas, CyberRep, in order to protect its investment in training Employee and to preserve the confidentiality of such confidential and proprietary materials, requires Employee to execute this Agreement as a condition of commencing such employment;

Now, Wherefore, in consideration of Employee's employment with CyberRep, Employee agrees as follows:

### Section 1.        Confidentiality

a. As used in this Agreement, "Confidential Information" shall mean all systems, processes, strategies, computer programs, business plans, business ideas and concepts, project data, scripts and other information; all employee, sales and marketing information, including, but not limited to employee lists and customer lists (past and present); all information on prospects, past and present; all financial information, correspondence, legal documents, files, internally or externally generated compilations, studies, notes or other information and know how, whether or not in writing, of a private, secret or confidential nature concerning the business or financial affairs or business methods of CyberRep, regardless of whether such information is specifically labeled as "proprietary" or "confidential."

b. Employee shall not disclose any Confidential Information to others outside of CyberRep (except as part of Employee's performance on behalf of CyberRep), or use the same for any unauthorized purpose, without the prior written approval by CyberRep, either during or after Employee's employment with CyberRep, unless such Confidential Information has become public knowledge without fault of the Employee.

c. Employee agrees that all tangible material containing the Confidential Information, whether created by Employee or others, which shall come into Employee's custody or possession during the term of Employee's employment, shall be and is the exclusive property of CyberRep to be used by Employee only in the performance of Employee's duties for CyberRep, and to be returned to CyberRep immediately upon termination of Employee's employment or appropriate reimbursements will be deducted out of final paycheck.

d. Employee agrees that Employee shall not disclose or use information, know-how and records of the types set forth in this paragraph 1, which would fall within the definition of Confidential information, except that it belongs to a third party with whom CyberRep has a contractual relationship which obligates CyberRep to maintain the confidentiality of such information, except to the extent that such disclosure or use would be required during the course of the performance by Employee of Employee's duties on behalf of CyberRep and such disclosure or use does not constitute a breach of the contractual relationship between CyberRep and the third party

e. Employee acknowledges that the Confidential Information is subject to the confidentiality provisions of 12 C.F.R. Part 309 and may contain customer information subject to the Right to Financial Privacy Act. Any unauthorized use of the Confidential information, therefore, may result in the imposition of criminal penalties under 18 U.S.C. Section 641

### Section 2.        Non-Solicitation

During the term of the Employee's employment with CyberRep, and for the next succeeding twelve (12) months, Employee shall not, directly or indirectly: (1) solicit or induce, or attempt to induce, any other person or entity having any continuing or periodic contractual relationship with

CyberRep (including, but not limited to an employment relationship) to terminate, reduce or materially alter their relationship with, or otherwise cease negotiations and/or business activity with, CyberRep; or (2) solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any persons who had a contractual relationship with CyberRep or with whom CyberRep was involved in negotiating any relationship within six (6) months of the effective date of termination.

### Section 3.        Non-Competition

Employee agrees that, during the term of this Agreement and for one (1) year from the date of the termination of Employee's employment with CyberRep, Employee shall not, directly or indirectly engage in competition with CyberRep in any manner or any phase of the business which is being conducted by CyberRep during the term of Employee's employment, including the systems related to the products or services being sold by CyberRep, without CyberRep's prior written consent, whether alone or as a partner, officer, agent, joint venturer, investor, lender, director or stockholder (except as a less than 10% shareholder of a publicly-traded corporation), or as a consultant, advisor or employee, or otherwise, of any other entity or individual in the United States which is in the same or substantially similar business as CyberRep or CyberRep's affiliate or parent.

### Section 4.        Miscellaneous

a. The restrictions contained in this Agreement are necessary for the protection of the trade secrets, proprietary information and contractual relationships of CyberRep, all of which Employee acknowledges may be disclosed to Employee while in CyberRep's employ, and are considered by Employee to be reasonable for such purpose. Employee agrees that any breach of this Agreement will cause CyberRep substantial and irrevocable damage and therefore, in the event of any such breach, Employee agrees that, in addition to any other remedies that may be available, CyberRep shall have the right to seek specific performance and injunctive relief, without the need to post a bond or other security.

b. In the event any restriction set forth in this Agreement is found by a court of competent jurisdiction to be unenforceable because it extends for too long a period of time, or over too great a range of activities, or in too broad a geographic area, such restriction shall be interpreted to extend only over the maximum period of time, range of activities or geographic areas as to which it may be enforceable.

c. Employee represents that Employee's employ with CyberRep does not and shall not breach any agreement to which Employee is presently a party or by which Employee is presently bound.

d. This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement.

e. This Agreement may be amended or modified only by a written instrument executed by both CyberRep and Employee.

f. No delay or omission by CyberRep in exercising any right under this Agreement shall operate as a waiver of that or any other right.

g. In case any provision of this Agreement shall be invalid, illegal or otherwise unenforceable by a tribunal of competent jurisdiction, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year set forth above.

_____        CHRIS TRANQUILL
Employee Signature                     Printed Name

_____        FORREST CLAYTON
CyberRep Signature / Title            Printed Name

DIRECTOR OF ASSOCIATE SERVICES

# EXHIBIT B

## CONFIDENTIALITY, NON-SOLICITATION, AND NON-COMPETITION AGREEMENT

This Confidentiality, Non-Solicitation and Non-Competition Agreement ("Agreement") is made as of the 26 day of June, 20 01, by and between CyberRep Corporation ("CyberRep") and Employee ("Employee").

**Whereas**, CyberRep desires to employ Employee, and Employee desires to be employed by CyberRep; and

**Whereas**, as part of Employee's position with CyberRep, Employee will be provided with extensive training by CyberRep, as well as access to certain proprietary and confidential materials and information owned by CyberRep, CyberRep's assigns, customers and clients; and

**Whereas**, CyberRep, in order to protect its investment in training Employee and to preserve the confidentiality of such confidential and proprietary materials, requires Employee to execute this Agreement as a condition of commencing such employment;

**Now, Wherefore**, in consideration of Employee's employment with CyberRep, Employee agrees as follows:

**Section 1.**   **Confidentiality**

a. As used in this Agreement, "Confidential Information" shall mean all systems, processes, strategies, computer programs, business plans, business ideas and concepts, project data, scripts and other information; all employee, sales and marketing information, including, but not limited to employee lists and customer lists (past and present); all information on prospects, past and present; all financial information, correspondence, legal documents, files, internally or externally generated compilations, studies, notes or other information and know how, whether or not in writing, of a private, secret or confidential nature concerning the business or financial affairs or business methods of CyberRep, regardless of whether such information is specifically labeled as "proprietary" or "confidential."

b. Employee shall not disclose any Confidential Information to others outside of CyberRep (except as part of Employee's performance on behalf of CyberRep), or use the same for any unauthorized purpose, without the prior written approval by CyberRep, either during or after Employee's employment with CyberRep, unless such Confidential Information has become public knowledge without fault of the Employee.

c. Employee agrees that all tangible material containing the Confidential Information, whether created by Employee or others, which shall come into Employee's custody or possession during the term of Employee's employment, shall be and is the exclusive property of CyberRep to be used by Employee only in the performance of Employee's duties for CyberRep, and to be returned to CyberRep immediately upon termination of Employee's employment or appropriate reimbursements will be deducted out of final paycheck.

d. Employee agrees that Employee shall not disclose or use information, know-how and records of the types set forth in this paragraph 1, which would fall within the definition of Confidential Information, except that it belongs to a third party with whom CyberRep has a contractual relationship which obligates CyberRep to maintain the confidentiality of such information, except to the extent that such disclosure or use would be required during the course of the performance by Employee of Employee's duties on behalf of CyberRep and such disclosure or use does not constitute a breach of the contractual relationship between CyberRep and the third party.

e. Employee acknowledges that the Confidential Information is subject to the confidentiality provisions of 12 C.F.R. Part 309 and may contain customer information subject to the Right to Financial Privacy Act. Any unauthorized use of the Confidential Information, therefore, may result in the imposition of criminal penalties under 18 U.S.C. Section 641.

**Section 2.**   **Non-Solicitation**

During the term of the Employee's employment with CyberRep, and for the next succeeding twelve (12) months, Employee shall not, directly or indirectly: (1) solicit or induce, or attempt to induce, any other person or entity having any continuing or periodic contractual relationship with CyberRep (including, but not limited to an employment relationship) to terminate, reduce or materially alter their relationship with, or otherwise cease negotiations and/or business activity with, CyberRep; or (2) solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any persons who had a contractual relationship with CyberRep or with whom CyberRep was involved in negotiating any relationship within six (6) months of the effective date of termination.

**Section 3.**   **Non-Competition**

Employee agrees that, during the term of this Agreement and for one (1) year from the date of the termination of Employee's employment with CyberRep, Employee shall not, directly or indirectly engage in competition with CyberRep in any manner or any phase of the business which is being conducted by CyberRep during the term of Employee's employment, including the systems related to the products or services being sold by CyberRep, without CyberRep's prior written consent, whether alone or as a partner, officer, agent, joint venturer, investor, lender, director or stockholder (except as a less than 10% shareholder of a publicly-traded corporation), or as a consultant, advisor or employee, or otherwise, of any other entity or individual in the United States which is in the same or substantially similar business as CyberRep or CyberRep's affiliate or parent.

**Section 4.**   **Miscellaneous**

a. The restrictions contained in this Agreement are necessary for the protection of the trade secrets, proprietary information and contractual relationships of CyberRep, all of which Employee acknowledges may be disclosed to Employee while in CyberRep's employ, and are considered by Employee to be reasonable for such purpose. Employee agrees that any breach of this Agreement will cause CyberRep substantial and irrevocable damage and therefore, in the event of any such breach, Employee agrees that, in addition to any other remedies that may be available, CyberRep shall have the right to seek specific performance and injunctive relief, without the need to post a bond or other security.

b. In the event any restriction set forth in this Agreement is found by a court of competent jurisdiction to be unenforceable because it extends for too long a period of time, or over too great a range of activities, or in too broad a geographic area, such restriction shall be interpreted to extend only over the maximum period of time, range of activities or geographic areas as to which it may be enforceable.

c. Employee represents that Employee's employ with CyberRep does not and shall not breach any agreement to which Employee is presently a party or by which Employee is presently bound.

d. This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement.

e. This Agreement may be amended or modified only by a written instrument executed by both CyberRep and Employee.

f. No delay or omission by CyberRep in exercising any right under this Agreement shall operate as a waiver of that or any other right.

g. In case any provision of this Agreement shall be invalid, illegal or otherwise unenforceable by a tribunal of competent jurisdiction, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year set forth above.

_____        Jeff Ventis
Employee Signature                      Printed Name

_____ Asb    Robert Waters
CyberRep Signature / Title              Printed Name

# EXHIBIT C

# Non-Disclosure Agreement

**Name:** Brian K Timmons

**WIN:** 20367344

## EMPLOYEE NON-DISCLOSURE, NON-SOLICITATION AND INTELLECTUAL PROPERTY AGREEMENT

I, the undersigned, in consideration for my employment by Affiliated Computer Services, Inc. or one of its subsidiaries or affiliates (individually and collectively, "the Company"), agree as follows:

1. <u>Confidential Information.</u> At all times during and after my employment with the Company I will hold in strict confidence and will not disclose, publish or use, directly or indirectly, for my benefit or the benefit of others, any Confidential Information of the Company, except as the disclosure, use or publication is required in connection with my work for the Company, or unless an officer of the Company expressly authorizes that use or disclosure in writing. "Confidential Information" means information in any form that may be disclosed to me by the Company or which I may otherwise learn during the course of my employment that relates to the business of the Company or any customer or supplier of the Company or any other party with which the Company agrees to hold information of that party in confidence. Confidential Information includes, but is not limited to, technical information, marketing and business strategies, product plans, business processes and techniques, lists of suppliers, customer names and requirements, pricing and bidding strategies and techniques, financial data, personnel information regarding the skills and compensation of other employees of the Company, personally identifiable information about any individual, and "Intellectual Property" (as defined below).

2. <u>Disclosure of Intellectual Property.</u> I will promptly disclose to the Company all inventions, improvements, designs, discoveries, original works of authorship, formulas, processes, computer software programs, databases and trade secrets (collectively "Intellectual Property"), that I conceive, develop or first reduce to practice in whole or in part, either alone or jointly with others, during the period of my employment, whether or not the Intellectual Property is patentable, copyrightable or protectable as a trade secret. The term "Intellectual Property" does not include any item to the extent that inclusion of that item in the definition of Intellectual Property would render any provision in this Agreement unenforceable.

3. <u>Assignment of Intellectual Property.</u> I agree that all Intellectual Property that (a) results from any work performed by me as part of my employment with the Company, or (b) results from the use of any resource of the Company or its suppliers or customers, including but not limited to trade secrets, materials, equipment, facilities, or time, or (c) relates to the Company's actual or contemplated operations, research or business, will be the sole and exclusive property of the Company. I hereby irrevocably assign to the Company and its successors and assigns, all right, title and interest to all Intellectual Property described in the preceding sentence. The Company and I each acknowledge that this Agreement constitutes receipt of notice from the Company that this paragraph does not apply to any Intellectual Property: (i) for which no materials, equipment, supplies, facilities, resources or trade secret information of the Company or its suppliers or customers were used; and (ii) which was developed entirely on my own time; and (iii) does not at the time of conception or reduction to practice relate to the business of the Company or its suppliers or customers or to their actual or demonstrably anticipated research or development; and (iv) which does not result from any work performed by me for the Company.

4. <u>Works of Authorship.</u> I agree that any and all works of authorship in any medium including, without limitation, any creation, modification or enhancement of software or computer technology or programs, produced in the course of my work for or employment by the Company, solely or with others, are works produced for hire and, together with all copyrights in and to each of such works, constitute the sole property of the Company. I hereby irrevocably relinquish and forever waive for the benefit of the Company any "moral rights" (defined as either any right to claim authorship of a work or any right to object to any distortion or other modification of a work, or any similar right existing under the law of any country in the world or under any international agreement) in any work of authorship.

5. <u>Assistance.</u> I agree to assist the Company at its request to obtain and enforce patents, copyrights, trademarks, domain names, trade secret rights and other legal protections (collectively, "Legal Protections") for the Company's Intellectual Property in any and all countries. I will execute any documents the Company may reasonably request for use in obtaining or enforcing the Legal Protections related to the Company's Intellectual Property. My obligations under this paragraph will continue beyond the termination of my employment with the Company. I irrevocably appoint the Secretary of the Company as my attorney-in-fact to execute documents on my behalf for this purpose.

6. <u>Non-solicitation of Employees.</u> During the period of my employment and for a period of twelve months following the date of the termination of my employment with the Company, I will not, on my own behalf or on behalf of any other person or business entity, hire, solicit, seek to hire, or offer employment to any person who is, during that period, an employee of the Company, or in any other manner attempt, directly or indirectly, to influence or encourage any employee of the Company to leave the employment of the Company.

7. <u>Representation Concerning Conflicting Obligation.</u> I represent that my performance of the terms of this Agreement as an employee of the Company does not and will not breach any agreement to treat as confidential the information of any other party acquired by me in confidence or in trust prior to my employment with the Company. I represent that I have not entered into, and agree that I will not enter into, any agreement, written or oral, in conflict with this Agreement.

8. <u>Return of Company Property and Documents.</u> Upon termination of my employment or at any time at the request of the Company, I will deliver to the Company all tangible property of the Company, including equipment, in my custody or control and all originals and copies in any form of notes, memoranda, financial information, specifications, source code, object code, materials and documents in my custody or control containing Confidential Information of the Company.

9. <u>Name and Likeness Rights.</u> I authorize the Company during and after my employment to use and reuse, and to grant others the right to use and reuse, in the ordinary business affairs of the Company, my name, photograph, likeness, voice and biographical information and any reproduction or simulation thereof in any media now known or hereafter developed.

10. <u>Legal and Equitable Remedies.</u> Because I may have access to and learn Confidential Information of the Company, the Company has the right to enforce this Agreement by injunction, specific performance or other equitable relief, without bond, without prejudice to any other rights and remedies the Company may have for a breach of this Agreement. I agree that injunctive relief is appropriate to enforce paragraphs 1 through 8 of this Agreement and expressly consent to the entry of such relief.

11. <u>Governing Law.</u> THIS AGREEMENT AND ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH IT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF TEXAS, WITHOUT REGARD TO OR APPLICATION OF CHOICE OF LAW RULES OR PRINCIPLES. IF ANY PROVISION OF THIS AGREEMENT IS FOUND BY A COURT, ARBITRATOR OR OTHER TRIBUNAL TO BE ILLEGAL, INVALID OR UNENFORCEABLE, THEN THAT PROVISION WILL NOT BE VOIDED, BUT WILL BE ENFORCED TO THE MAXIMUM EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AND THE REMAINDER OF THIS AGREEMENT WILL REMAIN IN FULL FORCE AND

EFFECT. THE FAILURE OF THE COMPANY TO INSIST ON STRICT PERFORMANCE OF ANY OF THE TERMS OR CONDITIONS OR TO EXERCISE ANY RIGHTS UNDER THIS AGREEMENT SHALL NOT BE CONSTRUED AS A WAIVER OF THE COMPANY'S RIGHTS OR TO RELY UPON OR ENFORCE THOSE RIGHTS AT ANY TIME THEREAFTER.

12.  General. The provisions of this Agreement shall survive the termination of my employment with the Company and the assignment of this Agreement by the Company to any successor in interest or other assignee. I authorize the Company to notify my actual or future employers of the terms of this Agreement and my responsibilities hereunder. The provisions of this Agreement may not be modified, amended or waived except by a written instrument duly executed by both parties.

**BY INITIALING THE BOX BELOW I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND MY OBLIGATIONS UNDER THIS AGREEMENT AND THAT I INTEND TO BE BOUND BY THIS AGREEMENT. I SPECIFICALLY ACKNOWLEDGE THAT I AM AWARE OF THE NOTICE CONTAINED IN PARAGRAPH 3, ASSIGNMENT OF INTELLECTUAL PROPERTY.**

Your Initials:  BT                                              Date:      5/4/2009

Rev 060503

# EXHIBIT D



Xerox Code of
Business Conduct

# Code of Business Conduct: Connecting with Our Core Values



## Requiring Premium Return on Assets

We earn our customers' trust the only way we know how—by delivering on our commitments. We are resolved to use our assets effectively to advance our success. Our future depends on it.

### Safeguarding and Using Xerox Assets

Each of us is accountable both for safeguarding all assets entrusted to us from loss, theft, waste, misappropriation or infringement and for using them to advance the interests of Xerox. We are accountable to classify, protect and handle Xerox, customer and other third-party information in accordance with all applicable laws, Xerox policy and any applicable contractual terms. We have an affirmative duty to immediately report the theft, loss or misappropriation of any Xerox or customer assets, including financial assets, physical assets, information assets and electronic assets, via designated reporting channels.

### Business Records—Creation and Management

Accurately and honestly preparing business records, including expense reports, time reporting and financial statements, is a business and legal imperative. We classify, use and handle business records in accordance with Xerox policies. We take our obligation to maintain business records for operational, legal, financial, historical and other purposes seriously and take appropriate steps to ensure that the content, context and structure of our records are reliable and authentic. We manage records consistent with the retention and destruction guidelines applicable to our functions. We preserve pertinent records after having received legal notice of a pending lawsuit. We give electronic records, including e-mails, the same consideration as hard copy records.

### Protection of Intellectual Property and Copyrighted Material

Among our most valuable assets is our Xerox intellectual property—inventions, patents, trade secrets, trademarks, copyrights, design rights, know-how and other proprietary information. We are accountable to establish, protect, maintain and defend Xerox's rights in all commercially significant intellectual property and original works of authorship (including, but not limited to, computer programs, equipment manuals and databases) and to use those rights in responsible ways. We respect the valid, exclusive, intellectual property rights or copyrighted materials of third parties.

The Xerox Office of General Counsel is an excellent resource for more information on the use and disclosure of Xerox's and third parties' intellectual property.

We are accountable to contact Public Relations for approval before committing to a speech, interview, article, customer endorsement, press release or other published or broadcast statement that references Xerox for external audiences. We do not respond to questions from members of the investment community, but rather we refer them to Xerox Investor Relations.

---

Policy References:

**SEC 003: Physical Security–General Policy**

**InfoSec 001: Information Security**

**AUD 001: Internal Audit Charter**

**CAC 101: Capital Appropriations**

**ACC 1701: Xerox Internal Control Framework**

**ADS 002: Business Records Management**

**MIP 001: Management of Intellectual Property Process**

**OGC 014: Licensing Policy**

**OGC 017-1: Proper Use of the Xerox Trademark**

**OGC 017-2: Commercial Use of the Xerox Trademark by Vendors**

**OGC 017-3: Editorial Use of the Xerox Trademark**

**OGC 017-4: Product Nomenclature & Company Names - Selection & Maintenance of Trademarks & Trading Names**

**OGC 018.1: Copyright Registration Requirements**

---

I worked on developing some software for Xerox, but the Company has decided to abandon the project since there was not a sufficient business justification for further investing in the software. I think the software has much potential to help businesses. May I continue to develop the software, on my own time, and sell it to businesses outside Xerox?

**Answer:** No. Xerox owns the intellectual property rights in any software you worked to develop during your employment with the Company. All Xerox Intellectual Property is the property of the Corporation as a whole, and ultimate responsibility for its management resides with the Corporation.